USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/31/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JESENIA RAMIREZ,

          Plaintiff,

     -against-

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

23-CV-5806 (VSB) (BCM)

**REPORT AND RECOMMENDATION
TO THE HONORABLE VERNON S.
BRODERICK**

**BARBARA MOSES, United States Magistrate Judge.**

     Plaintiff Jesenia Ramirez, proceeding pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeks judicial review of a final determination of the Commissioner of Social Security (Commissioner) denying her application for Disability Insurance Benefits (DIB). For the reasons that follow, I recommend that this action be remanded to the Commissioner for further proceedings, consistent with the analysis below.

## I.    BACKGROUND

     Plaintiff was born on December 20, 1980. *See* Certified Administrative Record (Dkt. 8) (hereinafter "R. __") 27, 148, 179. From 2009 to 2011 she worked as a line cook. (R. 47-48.) From 2011 to 2016 she worked for a tax-preparation firm, where she was promoted to location manager. (R. 48.) While there, plaintiff was injured in two car accidents, leading to chronic pain in her lower back and left leg. (*See, e.g.*, R. 381-82.) Beginning in 2016, she was self-employed as a tax preparer. (R. 50, 186-88.) In March 2020, she stopped working, and has not worked since. (*See, e.g.*, R. 32.)

     Plaintiff applied for DIB on July 15, 2020, at age 39, alleging disability since March 15, 2020, due to a dislocated left hip, spinal stenosis, and chronic pain. (R. 179, 245.) In her Function Report, she wrote that she was not able to "carry, lift [or] hold things for extended period[s] of time" due to "pain from bulging spinal discs, dislocated left hip, [and] consistent lower back

inflammation." (R. 264.) At times the pain was "so strong it keeps me awake." (R. 265.) Plaintiff wrote that her children assisted with household chores, because she was not able to "bend, lift, squat, run [or] walk" (R. 265), but that she was able to prepare meals 2-3 times per week, perform light dusting and cleaning of countertops and tables, use the dishwasher, walk, drive a car, and use public transportation. (R. 266.) Plaintiff estimated that she could walk for 30-40 minutes before needing to rest for 10 minutes, but could only stand for 10-15 minutes. (R. 269.)

The Social Security Administration (SSA) denied plaintiff's claim initially on March 10, 2021 (R. 107), and again, on reconsideration, on August 12, 2021. (R. 114.) On December 14, 2021, plaintiff and her counsel appeared by telephone before Administrative Law Judge (ALJ) Mark Solomon (R. 25), who took testimony from plaintiff (R. 31-44) and from Vocational Expert (VE) Jeannie Deal. (R. 45-59.)[1] On January 6, 2022, the ALJ issued a written decision (Decision) (R. 13-20), concluding that plaintiff was not disabled within the meaning of the Act. On May 19, 2023, the Appeals Council denied review (R. 1-4), rendering the ALJ's determination final.

Plaintiff filed this action on July 6, 2023 (Dkt. 1), and it was referred to me for report and recommendation on July 25, 2023. (Dkt. 7.) On December 11, 2023, plaintiff filed a motion seeking "judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g)" (Dkt. 13), supported by a brief (Pl. Br.) (Dkt. 14).[2] On February 6, 2024, the Commissioner filed an opposition brief (Def. Br.) (Dkt. 15), and on March 1, 2024, plaintiff filed a reply brief (Pl. Reply) (Dkt. 16).

---

[1] Deal's resume (R. 271) reflects the correct spelling of her name.

[2] The Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g), in effect since December 1, 2022, dispense with the need for such motions. *See* Supp. Soc. Sec. R. 5 ("The action is presented for decision by the parties' briefs.").

II.     **SUMMARY OF RELEVANT MEDICAL EVIDENCE**

A.     **Treating Providers**

During the relevant period, plaintiff sought treatment, principally for her back pain, from various providers at 14 Street Medical, PC (14 Street Medical) and Columbia University's Irving Medical Center (Columbia University); orthopedist Dilshad Atwal, M.D.; internist Naveen Pesala, M.D.; internist Richard Lopez, D.O.; various providers at Complete Neurological Care PC (CNC); gastroenterologist Jay Desai, M.D.; pain management specialist Suelane Do Ouro, M.D. and physician assistant Asya Shtofmakher, at New York Pain Relief Medicine, PLLC (N.Y. Pain Relief); and neurologist Anna Bank, M.D.

1.     **14 Street Medical**

Plaintiff was treated at 14 Street Medical between December 2019 and July 2020. (R. 287-303.) She presented on December 29, 2019, complaining of sharp, tingling back pain ("pain level without meds 10/10" and "worsening") and numbness in both hands. (R. 304-05.) On physical examination, however, plaintiff was ambulating normally, with normal gait and station, and had normal motor strength and tone. (R. 306.) A January 15, 2020 exam revealed full range of motion (ROM) in the spine, no tenderness or spasms, full ROM and full strength (5/5) in all upper and lower extremities, and normal gait, posture, and station. (R. 303.)

During a January 20, 2020 physical exam, Shervin Najafi, M.D. found scoliosis, but no tenderness or spasms in plaintiff's back. (R. 299.) In her low back, Dr. Najafi noted pain with rotation, pain with extension, decreased ROM, and bilateral paraspinal spasms. (*Id*.) Treating notes from January 27 and June 23, 2020, reflect similar findings. (R. 290-96.) Dr. Najafi diagnosed plaintiff with scoliosis and lumbar radiculopathy. (R. 296.) He recommended that plaintiff start yoga and aquatic therapy to manage her scoliosis. (*Id.*)

On June 23, 2020, plaintiff presented to Anam Azeem, M.D., with worsening right thigh pain. (R. 291.) On examination, Dr. Azeem found that plaintiff's ROM on flexion and abduction was reduced in the right hip (4/5), but otherwise normal throughout the hips and lower extremities. (R. 292.) He also found decreased light touch sensation in the right thigh. (*Id*.) Dr. Azeem diagnosed lumbar spondylosis, "with possible right meralgia paresthetica," and prescribed Baclofen (a muscle relaxant) and Tramadol (a narcotic pain medication). (R. 293.)

On July 21, 2020, plaintiff presented to 14 Street Medical complaining of abdominal pain and diarrhea, starting three weeks earlier. (R. 287, 289.)

### 2.      Columbia University

Plaintiff presented to Columbia University on July 28, 2020, with back pain that "occasionally" radiated down both legs, and "some pain associated with weakness but no specific muscular groups." (R. 375.) Neurologist Patrick Reid, M.D., wrote that plaintiff "has clearly been in a lot of pain for a long time," but concluded that surgery was unlikely to help, as "she has no focal mechanical lesions that are concordant with her symptoms." (R. 376.)

On December 21, 2020, plaintiff complained of severe pain in her left leg and low back, which she described as 10/10 in all positions, at all times, and was aggravated by movement. (R. 381-82.) She also reported gastrointestinal symptoms, including diarrhea. (R. 384.) Zeeshan Sardar, M.D., examined plaintiff and found decreased light touch sensation on her left side from L2 to L5 and at S1. (R. 384.) Plaintiff's deep tendon reflexes were normal, and her motor function was 5/5 on the right and 4+/5 on the left. (*Id.*) Plaintiff's gait was antalgic. (R. 385.) X-rays of her lumbar spine revealed mild spondylitic changes at L4-5 and L5-S1. (R. 385.) An MRI found mild disc desiccation and mild stenosis in the same locations. (*Id.*) Imaging also revealed right-sided facet arthropathy at L4-5. (*Id.*) However, Dr. Sardar noted that plaintiff's weakness and decreased sensation did not "match" the MRI findings, and consequently recommended "conservative

therapies," including physical therapy, adding that he did "not think that she would benefit from surgical treatment." (R. 386.) At that time, plaintiff reported that she was taking Oxycodone (a narcotic pain medication), muscle relaxants, and marijuana. (R. 382.)

### 3.    Dr. Atwal

Plaintiff presented to Dr. Atwal on October 26, 2020, complaining of low back pain, which she rated 10/10, and hip pain. (R. 717-18.) Plaintiff said that her symptoms worsened with walking, sitting, bending forward, and lying on her left side. (R. 717.) She further reported that her symptoms had improved with steroid injections, but that a course of physical therapy had brought no relief. (R. 718-19.)[3] On examination, Dr. Atwal found tenderness to palpation in the low back, along with a mild spasm and decreased ROM in all planes due to pain. (R. 718.) Plaintiff's deep tendon reflexes were 2+ (normal) in her lower extremities. (*Id.*) Dr. Atwal diagnosed lumbar radiculopathy, low back pain, and myalgia. (*Id.*) He scheduled a transforaminal epidural steroid injection (TFESI) and directed plaintiff to "[c]ontinue conservative therapy (home stretching, ice/heat)" and to take non-steroidal anti-inflammatory drugs (NSAIDs) as needed. (R. 719.)

On November 2, 2020, plaintiff was given TFESIs at L4-L5 and L5-S1. (R. 715.) Two days later, "she felt significant relief in her radicular pain," but complained of compression and pain in her hip, as well as "severe abdominal pain" (R. 714), and was advised to go to the emergency room (ER). (*Id.*)[4] During a November 10, 2020 appointment, she reported that, despite the abdominal symptoms, her pain had improved overall, to 3/10. (R. 711.)

---

[3] The SSA requested plaintiff's treating note from Adam Physical Therapy (*see* R. 71, 87), but apparently did not receive them, as they are not in the administrative record.

[4] The ER treating notes were not before the ALJ. However, plaintiff reported to Dr. Atwal at her next visit that she was treated in the ER "for possible UTI [urinary tract infection] and released." (R. 711.)

On December 1, 2020, plaintiff reported "100% relief from pain" during the two weeks following the injections, but complained that since then, the pain "returned to baseline" – rating the severity 9/10. (R. 707.) Dr. Atwal again recommended "conservative therapy (home stretching, ice/heat)" and NSAIDs as needed. (R. 709.) On December 10, 2020, plaintiff reported that she had determined, while exercising at home, that "physical therapy exercises 'lock' her spine." (R. 702.) Dr. Atwal administered a left lower thoracic/lumbar injection and advised continued conservative therapy and NSAIDs. (R. 704.) Five days later, plaintiff's pain was 10/10, with numbness, tingling, and balance difficulties. (R. 698, 701.) Dr. Atwal prescribed Flexeril (a muscle relaxant) and referred her to a spinal surgeon. (R. 701.)

Plaintiff underwent another round of injections on December 28, 2020 (R. 695), and reported on January 18, 2021, that they provided relief for 2-3 days before the pain returned. (R. 693.) On that date, she did "not endorse much radicular pain." (*Id.*) But by March 8, 2021, her pain had worsened, and she declined Flexeril, requesting "'real' pain medication." (R. 685-88.) Manual muscle testing found strength of at least 4+/5 in all lower extremities, but plaintiff reported spasms and impaired balance. (*Id.*) Dr. Atwal prescribed a cane, "as requested by patient." (R. 688.)[5]

### 4.      Dr. Pesala

Plaintiff was treated by Dr. Pesala between April and October 2021. (R. 513-47, 439-55.) At an initial, virtual consultation on April 16, 2021, plaintiff complained of chronic back pain, reporting that she did not tolerate steroid injections and that the pain had worsened, "sometimes [] mak[ing] her use a walking cane." (R. 545-46.) She also complained of weight gain, stating that

---

[5] During her March 8, 2021 visit, plaintiff was "verbally abusive to provider and staff." (R. 688.) When offered "Medrol Dose Pak/NSAIDs and muscle relaxer," she "refused and repeatedly asked for 'real' pain medication in elevated tone with the use of profane language." (*Id.*) Dr. Atwal "encouraged [plaintiff] to seek second opinion from another pain management physician." Insofar as the record reveals, this was plaintiff's last visit to Dr. Atwal.

she added fifty pounds during the COVID-19 pandemic. (R. 546.) Plaintiff raised similar complaints during an April 23, 2021 office visit, and added that she had difficulty swallowing. (R. 540, 443.) The April 23 treating notes report plaintiff was 60 inches tall and weighed 162 pounds. (R. 541.) During that visit, Dr. Pesala prescribed a topical gel for plaintiff's back pain, diagnosed plaintiff with "[i]rritable bowel syndrome without diarrhea," and directed her to follow a probiotic diet. (R. 544.)

Physical exams on April 23 and May 3, 2021, found plaintiff ambulating normally with normal gait and station. (R. 543-44.) During a June 15, 2021 exam, plaintiff used a cane, but Dr. Pesala noted normal gait, station, and deep tendon reflexes. (R. 534.) Treating notes from physical exams on July 13, September 2, and September 17, 2021, do not mention the cane, but reaffirm earlier findings of normal gait, station, and reflexes. (R. 518, 524, 530.)

On July 13, Dr. Pesala advised plaintiff to consider prescription acetaminophen and pain management therapy. (R. 530.) During telephonic consultations on July 27 and August 10, 2021, plaintiff continued to complain of IBS. (R. 526, 529.)[6]

### 5.     Dr. Lopez

Plaintiff presented to Dr. Lopez, on April 27, 2021, for her first (and, insofar the record reveals, only) visit, seeking "a THIRD opinion" regarding her low back pain. (R. 481.) She told Dr. Lopez that a recent epidural injection had "worsened her symptoms." (R. 486.) Dr. Lopez found limited ROM of the lumbar spine and decreased motor strength on the left side, but intact sensation, full strength on the right side, normal deep tendon reflexes, and negative Hoffman and

---

[6] On October 1, 2021, plaintiff requested that Dr. Pesala complete disability forms for social security. (R. 514.) When Dr. Pesala explained that he was "unable to fill the disability forms," plaintiff "became agitated." (*Id.*) The notes continue, "no services performed today." (*Id.*)

Romberg tests. (R. 483.) Plaintiff reported using marijuana but taking no prescribed medications. (R. 482.) Dr. Lopez referred her for consultation with a spine surgeon. (R. 484.)

### 6.      Complete Neurological Care

Plaintiff was examined at CNC on May 6, 2021. CNC's preliminary neurological report noted that she had a normal stride and stance and a casual gait that was "not antalgic, although [she] us[ed] a cane for ambulation." (R. 675.) Plaintiff had full strength (5/5) in the upper and lower extremities, normal tone and bulk, and no abnormal movements or tremors. (*Id.*)

Although plaintiff had an active prescription for Gabapentin (an anti-convulsant and nerve pain medication), she reported she had stopped taking it "for concern of side-effects." (*Id.*) Plaintiff declined "taking oral medications at this time" (*id.*), but disclosed that she "cook[ed] marijuana with her food" for pain relief. (R. 674.)

CNC "proposed alternative treatment options, such as neuropathic pain agents, NSAIDs, [and] physical therapy exercises," but plaintiff declined. (R. 675.) Plaintiff asserted that physical therapy had already been "contraindicated" by her spine surgeon, and requested that CNC provide her with a "medical note, stating that she is not able to do [] physical therapy, and that no further medical management would be benefitting her chronic condition." (*Id.*) CNC declined to provide that note before consulting with plaintiff's spine specialist. (*Id.*)[7]

---

[7] The CNC treating notes further state that CNC providers "explained to [plaintiff] that we have not exhausted the [t]reatment options available at our disposal, and we would be able to help her[] if she would agree to the therapeutic management suggested," but plaintiff "refused to try alternate treatment options to Gabapentin[.]" (R. 675.) Plaintiff became "defiant" when treatment options were proposed, and "requested in increased voice to provide her with a note, stating, that her 'condition is irreversable [sic]', and, that we 'can not help her further.'" (*Id.*)

### 7.    Dr. Desai

On May 14, 2021, Dr. Desai diagnosed plaintiff with dysphagia and GERD and instructed her to "take small bites, chew thoroughly," and "swallow upright with water." (R. 478.) His treating notes state that plaintiff had issues with diarrhea "in the past" but the problem "has resolved." (*Id.*)

### 8.    Dr. Do Ouro

Between July and October 2021, plaintiff was treated for pain management at N.Y. Pain Relief by Dr. Do Ouro and PA Shtofmakher. (R. 595-652.) Dr. Do Ouro initially examined plaintiff on July 21, 2021, finding "severe pain due to extension" on both sides of the lumbar spine, as well as "tenderness to deep palpitation" and decreased sensation and reflexes throughout the left leg and foot. (R. 647.) She also noted "positive facet loading on the left L4, L5, S1 area" and "limitation of side rotation due to pain." (*Id.*) Plaintiff's straight leg raising (SLR) test was "positive on the left at 40°" but negative on the right. (*Id.*) Dr. Do Ouro planned a limited course of opioids, to be used "transitionally until a more definitive treatment has been established or if the [plaintiff] no longer has options for definitive treatment," and counselled plaintiff that "non operative treatment," including "NSAIDs, physical therapy, [] activity modification" and sometimes "bracing," is "effective in a significant number of [lumbar radiculitis] cases." (R. 650.) Dr. Do Ouro prescribed Celebrex (a prescription NSAID) and Topamax (a nerve pain medication), as well as Tramadol (R. 652), and scheduled further TFESI injections. (R. 648.)

On September 10, 2021, Plaintiff complained that her pain had worsened, rating the severity 10/10, and reported severe spasms and cramping in her lower back, trouble sleeping, numbness, abdominal pain, nausea, and diarrhea. (R. 638-39.) PA Shtofmakher refilled her prescriptions for Celebrex, Topamax, and Tramadol, and "encouraged [plaintiff] to return to physical therapy." (R. 640, 643.) The plan remained to "combine the use of opioids with non-pharmacologic therapy and non-opioid pharmacologic therapy as appropriate." (R. 641.)

Four days later, plaintiff's pain had worsened again, "despite use of tramadol." (R. 631.) Plaintiff requested other drugs (*id.*), and was prescribed Nucynta (an opioid pain medication). (R. 637.) Treating notes from this visit indicate abdominal pain (R. 632), but do not mention diarrhea.

On September 21, 2021, Dr. Do Ouro performed a medial branch block, administering epidural steroid injections at L3-L4, L4-L5, and L5-S1. (R. 619-21.) Additionally, plaintiff was prescribed Gabapentin and hydromorphone (another opioid pain medication, commonly sold under the brand name Dilaudid). (R. 619, 626, 629-30.) Treating notes indicate that plaintiff was an "every day Marijuana user." (R. 624.) She complained of abdominal pain and nausea. (*Id.*)

At a follow-up visit on September 30, 2021, plaintiff reported her pain had been stable since the injections and rated it at 6/10. (R. 612.) PA Shtofmakher noted improvement "over 85%" since the medial branch block. (*Id.*) However, plaintiff reported continued abdominal pain, as well as blood in her stool. (R. 613.) PA Shtofmakher refilled her prescriptions for Celebrex and hydromorphone. (R. 615, 618.)

On October 5, 2021, plaintiff's pain remained at 6/10. (R. 608.) Dr. Do Ouro administered a TFESI at L4-L5. (R. 608-10.) At a follow-up visit three days later, plaintiff rated her pain at 7/10. (R. 601.) PA Shtofmakher noted "improvement over 85%" following the TFESI. (*Id.*) Plaintiff reported a "higher" level of function on her current regimen of medications. (*Id.*) At that point, plaintiff was taking Celebrex and hydromorphone, and using Pennsaid topical solution. (*Id.*)

During a telemedicine visit with PA Shtofmakher on October 11, 2021, plaintiff reported a pain level of 7/10. (R. 595.) She further reported severe numbness, including of her face, slurring of words, sweats, trouble sleeping, syncope, cough, shortness of breath, abdominal pain, and frequent urination. (R. 595-96.) PA Shtofmakher instructed plaintiff to "report to ER," whereupon

plaintiff advised that she was "entering her PCP office" for evaluation. (R. 597.) The record does not contain any notes regarding that visit.

### 9.    Dr. Bank

On October 13, 2021, plaintiff saw Dr. Bank for an initial evaluation. She reported numbness in both legs and "intermittent episodes of slurred speech, confusion, and spacing out." (R. 668.) However, her neurological exam was "normal," and Dr. Bank noted that plaintiff had "power 5/5 to confrontation throughout," a "narrow base gait" with "normal stance and stride," and a "normal arm swing." (R. 669-70.) Dr. Bank discussed physical therapy and pain medication, but plaintiff indicated she "prefers to hold off for now." (R. 670.)

### B.    Objective Medical Evidence

### 1.    Imaging

An MRI of plaintiff's lumbar spine on January 23, 2020, revealed "bilateral posterolateral disc protrusions" at L5-S1 "with associated annular fissures extending to ventral aspect of S1 nerve roots," as well as findings "consistent with degenerative change." (R. 329.) The MRI also showed mild disc space narrowing at L4-5, along with "[m]arked" facet arthropathy with hypertrophic change, resulting in a grade 1 anterolisthesis. (R. 366.) X-rays confirmed these findings. (R. 368-70.) Scoliosis series X-rays found mild levoscoliosis and mild multilevel spondylosis. (R. 369.) X-rays of plaintiff's hips revealed facet joint hypertrophic changes at the lower lumbar spine, but "[u]nremarkable" hip joints. (R. 370.) Additional imaging on September 17 and December 21, 2020, reaffirmed the January 23, 2020 findings. (R. 358-59, 362-63.) The X-rays of plaintiff's lumbar spine from December 21, 2020, showed facet arthropathy throughout the lower lumbar spine. (R. 387.) There was an "interval increase" of facet arthropathy as compared to earlier examinations. (*Id.*)

On July 22, 2020, an abdominal ultrasound revealed "[m]ultiple gallstones." (R. 319.) On August 12, 2020, an abdominal CT scan found a small liver hemangioma and a duodenal diverticulum, but no diverticulitis. (R. 364-65.) The results were otherwise normal, and no gallstones were detected. (*Id.*) On July 7, 2021, an esophagram returned normal results. (R. 551.)

### 2. Electrodiagnostic Testing

On December 31, 2019, electrodiagnostic testing found that plaintiff had normal nerve conduction, normal F Wave and H Reflex latencies, and no evidence of electrical instability of the muscles. (R. 338.) When tests were conducted again on January 9, 2020 – in connection with plaintiff's complaints of numbness in her left hand – the results were unchanged. (R. 333.)

On April 30, 2021, further electrodiagnostic testing was performed at CNC, showing normal nerve conduction and normal F Wave and H Reflex latencies. (R. 676-78.) However, that test also revealed "evidence of chronic bilateral L5 radiculopathy without denervation." (R. 676.)

### C. Opinion Evidence

### 1. Consultative Examiner Dr. Ravi

On December 24, 2020, Ram Ravi, M.D., conducted a consultative medical examination of plaintiff for the purpose of her DIB application. (R. 390.) Plaintiff complained of neck pain, back pain, left hip pain and left knee pain, all since 2013; neuropathy, since 2015; and asthma, since childhood, but "currently asymptomatic." (*Id.*) Plaintiff told Dr. Ravi that she was not taking any medications. (*Id.*) She stated that she regularly showed and dressed herself, but that pain limited her ability to shop, clean, and do laundry. (*Id.*)

Plaintiff had "difficulty with sitting" and with rising from the chair due to pain. (R. 391.) Her gait was "moderately antalgic," and she leaned to her right side. (*Id.*) She declined to squat and declined to walk on her heels and toes, due to pain. (*Id.*) However, Dr. Ravi noted that plaintiff "appeared to be in no acute distress," used no assistive devices, and needed no help changing for

the exam or getting on and off the exam table. (*Id.*) Dr. Ravi found no scoliosis, kyphosis, or abnormality in plaintiff's thoracic spine. (R. 392.) She had full ROM except in the lumbar spine and in the hips, where her ROM was limited in all planes. (*Id.*) Her joints were stable and nontender; her strength was 5/5 in her all extremities; and her SLR test was negative. (*Id.*) However, she had decreased sensation to light touch in both hands and both feet. (*Id.*)

Dr. Ravi opined that plaintiff had "[m]oderate to marked limitations to bending, pushing, pulling, lifting, and carrying," and that she should "[a]void smoke, dust, and other respiratory irritants/triggers." (R. 393.) He also found that plaintiff had "moderate" limitations in sitting, standing, and walking. (*Id.*) In the next sentence, however, Dr. Ravi wrote that plaintiff had "no limitations sitting." (*Id.*)

### 2.     State Agency Medical Reviewers Dr. Naroditsky and Dr. Putcha

State agency medical reviewer S. Naroditsky, M.D. surveyed the evidence of record on February 9, 2021 (including Dr. Ravi's report) and opined that plaintiff could occasionally lift and carry up to 20 pounds, frequently lift and carry up to 10 pounds, sit for about six hours, and stand or walk for about six hours in an eight-hour workday. (R. 74-75.) Dr. Naroditsky further opined that plaintiff's balance was not limited, but that she could only occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, or scaffolds (R. 75-76), and should avoid even moderate exposure to pulmonary irritants. (R. 77.)

On reconsideration, state agency medical reviewer S. Putcha, M.D. surveyed the record evidence again on August 12, 2021, and agreed that plaintiff could sit for six hours in an eight-hour workday; that her balance was not limited; that she could only occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, or scaffolds; and that she should avoid even moderate exposure to pulmonary irritants. (R. 90-92.) However, Dr. Putcha opined that plaintiff could stand

and/or walk for only two hours in eight-hour workday, and was limited to lifting and carrying only 10 pounds occasionally. (*Id.*)

### 3.    Dr. Do Ouro and PA Shtofmakher

In October, 2021 Dr. Do Ouro and PA Shtofmakher signed a medical source statement at the request of plaintiff's counsel. (R. 498-503.) They wrote that plaintiff suffered from "chronic pain syndrome" and was "[c]onstantly" in pain, which was "severe enough to interfere with attention and concentration." (R. 498-99.) They listed various "positive objective signs" supporting their opinion including some that appeared in their treating notes (decreased ROM, sensory and reflex changes, impaired sleep, weight changes, tenderness, muscle spasm and weakness, abnormal gait, and a positive SLR test) and some that did not (joint deformity, crepitus, joint instability, abnormal posture, trigger points). (R. 498.) Dr. Do Ouro and PA Shtofmakher opined that plaintiff could not sit or stand for more than 15 minutes at a time before needing to change position, and that she could not sit for more than three hours in the aggregate, or stand/walk for more than three hours in the aggregate, during an eight-hour work day – during which she would also require a two-hour rest break to lie down. (R. 499-500.) In their view, plaintiff could not lift more than five pounds, occasionally; could never balance or stoop; required a cane for all ambulation; and would be absent from work more than three times per month. (R. 501-03.) Finally, Dr. Do Ouro and PA Shtofmakher opined that plaintiff's condition had "existed and persisted, with the restrictions outlined in this medical Source Statement since 2014 (7 years)." (R. 503.)

## III.    THE HEARING

On December 14, 2021, plaintiff appeared, with counsel, before ALJ Solomon. (R. 27.) Plaintiff testified that she holds a bachelor's degree in business administration and was self-employed as a seasonal tax preparer until March 2020. (R. 32.) She stated that she stopped working because the "pain on my lower back started becoming very unbearable." (*Id.*)

Plaintiff testified that she lives with her adult daughter, who cares for her and does most of the shopping and housework. (R. 36.) While plaintiff can shower by herself, "[s]ometimes when the pain is too much" her daughter helps her get dressed. (*Id.*) When plaintiff does not have a doctor's appointment, she spends her time at home, watching the news or reading. (R. 40.) To manage the pain, she lays down and rotates between her stomach and her right side. (*Id.*) She told the ALJ that she can sit for 30-45 minutes before her back "locks" on her, and she needs to stand up and move around. (R. 36.) When this happens, it takes her 15 minutes to stand up straight, at which point she lays down on her stomach until the pain "goes away or becomes tolerable." (R. 37.) The entire process takes "about two-and-a-half to three hours, maybe a little longer." (*Id.*)

At the time of the hearing, plaintiff was being treated by Dr. Do Ouro, who had recently administered two steroid injections that made the pain "a little bit more tolerable," but caused her to experience side effects "maybe five days" after receiving the injection, where her body went "in and out of numbness." (R. 34-35.) She switched to a new medication, but had to stop in mid-October 2021, while doctors tried to determine the cause of the numbness. (R. 38.) At the time of the hearing, plaintiff testified that she was not taking any medication (*id.*), but had been prescribed a cane, which she used indoors and outdoors "to help me balance myself because I don't have complete balance." (R. 35.) Plaintiff stated that the cane allows her to stand for periods of up to 15 minutes. (R. 38.) Without the cane, she testified, she can stand for only five minutes before losing her balance. (*Id.*) Asked if she wished to add anything else regarding her condition, plaintiff testified that for the past two years, "my condition is just getting worse." (R. 41.)

Under questioning from her counsel, plaintiff testified that she weighed 130 pounds when she filed her application, but had since gained 55 pounds. (R. 42-43.) Additionally, as the result of

her two accidents, she suffers from osteoarthritis in her knee, had knee surgery in 2014, and experiences chronic pain in her left knee. (R. 43-44.)

Next, VE Deal testified. The VE classified plaintiff's past relevant positions as: (1) short order cook, DOT 313.374-014 (SVP 3), which was "light as performed"; (2) tax preparer, DOT 219.362-070 (SVP 4), which was "sedentary"; and a composite of tax preparer and office manager, DOT 169.167-034 (SVP 7), which was "performed at light." (R. 51-52.)[8]

The ALJ asked VE Deal whether plaintiff's past work could be performed by a hypothetical individual who:

> could perform light work inclusive of sedentary work with the ability to sit for at least six hours, stand and walk for total of six hours, but for sedentary jobs two hours; lift or carry up to 20 pounds occasionally and 10 pounds frequently for light jobs and ten pounds occasionally and five pounds frequently for sedentary jobs; occasional climbing, balancing, stooping, kneeling, crouching, and crawling; avoids concentrated exposure to respiratory irritants.

(R. 52.)[9] VE Deal opined that the hypothetical claimant could perform plaintiff's past jobs, both as generally and as actually performed (*id.*), and identified two additional light jobs (price marker

---

[8] Specific vocational preparation (SVP) refers to the amount of time it takes an individual to learn to do a given job. "SVP uses a scale from 1 to 9 and the higher the SVP number the greater the skill required to do the job." *Garcia v. Comm'r of Soc. Sec.*, 2022 WL 4234555, at *9 n.18 (S.D.N.Y. Sept. 14, 2022), *amended in part on other grounds*, 2022 WL 17103621 (S.D.N.Y. Nov. 22, 2022).

[9] Sedentary work:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). Light work:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing,

and office helper) that the same hypothetical claimant could perform. (R. 54.) The VE was not asked to identify any sedentary jobs that the hypothetical claimant could perform.

The ALJ then asked VE Deal whether her testimony would change if the hypothetical claimant "required the use of a handheld assistive device for both indoor and outdoor ambulation as well as balancing and standing." (R. 53.) The VE replied that "[i]f it is needed for balance as well as [for] the ambulation, Your Honor, I would say that that would be work preclusive," even for sedentary jobs. (R. 53-54.) Next, the ALJ asked whether there would be work for the hypothetical claimant if she could sit for only three hours in an eight-hour workday and stand or walk for only three hours in an eight-hour workday. (R. 55.) The VE opined that these limitations would preclude employment. (*Id.*) Finally, VE Deal testified that the maximum time off-task (outside of regularly scheduled breaks) would be 10% of the day, and that the acceptable level of absences (inclusive of late arrivals and early departures) would be one day per month. (*Id.*)

Plaintiff's counsel asked the VE whether a hypothetical claimant could do plaintiff's past work if she could only bend, push, pull, lift, or carry for fifteen percent of a workday. (R. 58.) VE Deal testified that some sedentary jobs would allow for this limitation, but that it would preclude

---

or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

"Occasionally" means "very little to up to one third of the time," while "frequently" means from one third to two thirds of the time. SSR 85-15, 1985 WL 56857, at *7; *see also Rozek v. New York Blood Ctr.*, 925 F. Supp. 2d 315, 328 (E.D.N.Y. 2013).

plaintiff's past work as an office manager, which was performed at the light level. (*Id.*) Counsel then asked, "if a person needed to change positions every 15 minutes between standing and sitting, could they do any of the work?" (R. 59.) VE Deal opined that this too would be work preclusive. (*Id.*)

## IV.   THE ALJ'S DECISION

ALJ Solomon issued his Decision on January 6, 2022. Before undertaking the five-step analysis mandated by 20 C.F.R. § 404.1520(a)(4)(i)-(v), the ALJ found that plaintiff met the insured status requirements of the Act through March 4, 2024. (R. 13.)

At step one of the five-step analysis, *see* 20 C.F.R. § 404.1520(a)(4)(i), the ALJ found that plaintiff "has not engaged in substantial gainful activity since March 15, 2020." (R. 13.) At step two, *see* 20 C.F.R. § 404.1520(a)(4)(ii), the ALJ found that plaintiff has the "severe" impairments of "lumbar radiculopathy; lumbar degenerative disc disease; obesity; and asthma." (*Id.*) The ALJ acknowledged plaintiff's IBS diagnosis, but found this impairment to be "non-severe," because "there is no evidence of complications," and plaintiff was "without diarrhea." (R. 13-14.)

At step three, *see* 20 C.F.R. § 404.1520(a)(4)(iii), the ALJ found that none of plaintiff's impairments, individually or in combination, "meets or medically equals the severity of one of the listed impairments" in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. 14.) To make this finding, the ALJ considered Listings 1.15 (disorders of the skeletal spine), 1.16 (lumbar spine stenosis), and 3.03 (asthma), and concluded that plaintiff's condition did not meet or medically equal the severity of any of them. (R. 14.) Noting that "obesity is no longer a listed impairment," the ALJ nevertheless considered plaintiff's obesity in terms of its possible effects on her "ability to work and ability to perform activities of daily living." (*Id.*) Although the ALJ "found the claimant's obesity to be severe," he concluded that "the signs, symptoms and laboratory findings of obesity are not of such severity as found in any listing." (R. 14-15.)

Before proceeding to step four, the ALJ determined plaintiff's residual functional capacity (RFC). (R. 15-19.) As part of this analysis, the ALJ found that plaintiff's impairments could be expected to cause the symptoms she alleged, but that her statements regarding the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 15.) In his discussion of the medical evidence, the ALJ highlighted that plaintiff's reported symptoms "did not match" the relatively mild MRI findings in the record; that she presented to most of her treating and examining sources ambulating normally, with normal gait and station, using no assistive device; and that her physical examinations were frequently normal as well, with the exception of limited ROM in the lumbar spine and reduced motor strength in the lower left extremity. (R.16-19.) The ALJ summed up his view of the evidence as follows:

> The claimant alleged severe restrictions in his [sic] ability to sit, stand, walk, and complete daily activities. However, pursuant to longitudinal physical examination findings, the claimant consistently presented with full muscle strength in all extremities, except in the left leg, limited range of motion of the lumbar spine, with normal gait and normal deep tendon reflexes.

(R. 19.)

The ALJ discussed and evaluated each of the medical opinions in the record. He found the opinion of Dr. Ravi (that plaintiff had "moderate" limitations in sitting, standing, and walking, and "moderate to marked" limitations in bending, pushing, pulling, lifting, and carrying) only "partially persuasive," because (i) plaintiff's later treatment records showed only "mild limits" and "documented minimal findings"; (ii) "the term moderate," as used by Dr. Ravi, "is vague"; and (iii) "the opinion is inconsistent as Dr. Ravi first notes moderate limits sitting and then finds no limits sitting." (R. 17.) The ALJ did not specify which parts of Dr. Ravi's opinion he found persuasive and which parts he found unpersuasive.

Next, the ALJ found the opinion of Dr. Do Ouro and PA Shtofmakher (that plaintiff could not sit or stand/walk for more than a total of three hours in an eight-hour workday, would need to change positions every 15 minutes and rest for two hours, and that her cane was medically necessary) "unpersuasive," because (i) it was inconsistent with the results of plaintiff's "contemporaneous neurology consultation" at CNC and the reports of Dr. Pesala; and (ii) Dr. Do Ouro and PA Shtofmakher opined that that the limitations they described "applied since 2014," which could not be the case, as plaintiff worked until March 2020. (R. 18.) The ALJ specifically rejected Dr. Do Ouro's conclusion that plaintiff's cane was medically necessary, noting that she did not use a cane when she saw Dr. Ravi; that she ambulated normally when she saw Dr. Pesala, as well as during her CNC consult; and that CNC found "normal power in [plaintiff's] lower extremities and neck, normal gait, normal sensation/reflexes and no limited range of motion." (*Id.*)

Finally, the ALJ found that the opinions of state agency reviewers Dr. Naroditsky (who found plaintiff capable of light work, with postural and environmental restrictions) and Dr. Putcha (who found plaintiff capable of sedentary work, with postural and environmental restrictions) were "generally persuasive," because "both physicians reviewed the available medical record." (R. 18-19.) However, the ALJ did not address the differences between those opinions.

ALJ Solomon concluded that plaintiff had the RFC to perform light work, as defined by 20 C.F.R. § 404.1567(b), with certain additional limitations. Plaintiff could sit for "6 hour[s] in an 8-hour workday; stand and/or walk 6 hours in an 8-hour workday; [and] lift and/or carry 20lbs occasionally and 10lbs frequently," but could perform only "occasional climbing, balancing, stooping, kneeling, crouching, [and] crawling." (R. 15.) Additionally, the ALJ concluded that plaintiff must "avoid concentrated exposure to respiratory irritants." (*Id.*)

At step four, *see* 20 C.F.R. § 404.1520(a)(4)(iv), on the basis of his RFC determination and the VE's testimony, the ALJ found that plaintiff could perform her past relevant work as a short order cook and tax preparer. (R. 19-20.) Consequently, the ALJ concluded that plaintiff was not under a disability, as defined in the Act, at any time since she filed her application. (*Id.*)

## V.    THE PARTIES' POSITIONS

Plaintiff argues principally that the ALJ failed to evaluate the medical opinion evidence in accordance with applicable regulations. Pl. Br. at 16-21. Plaintiff contends that the ALJ improperly discounted the opinions of Dr. Ravi and Dr. Do Ouro, and that reliance on the state agency opinions was also error, particularly given that they conflicted with one another. *Id.* at 17; Pl. Reply at 3. Plaintiff further contends that the ALJ erred by giving the VE an "incomplete hypothetical" that did not include all of plaintiff's limitations, including those caused by her chronic pain and her IBS. Pl. Br. at 21-23. Finally, plaintiff argues that the ALJ failed to consider whether her impairments would result in work-preclusive absences or time off-task. *Id.* at 24-25.

The Commissioner contends that the ALJ properly assessed the medical opinions in the record before relying on Dr. Naroditsky and discounting (either expressly or implicitly) the more restrictive opinions of Dr. Ravi, Dr. Putcha, and Dr. Do Ouro. Def. Br. at 17-22. Additionally, the Commissioner contends that substantial evidence (including the opinion of Dr. Naroditsky) supports the ALJ's RFC formulation, and hence the Commissioner's "final decision," Def. Br. at 12; that the ALJ adequately considered plaintiff's complaints of chronic pain, *id*. at 24-25; and that while plaintiff did occasionally report diarrhea, neither this symptom nor any other evidence in the record shows that plaintiff's IBS "significantly limited her physical or mental ability to perform basic work activities." (R. 24.) Finally, the Commissioner contends that the ALJ implicitly found that plaintiff's impairments would not cause excessive absenteeism or time off-task when he

rejected the opinion of Dr. Do Ouro and PA Shtofmakher, and was not required to "explicitly articulate" the persuasiveness of that each specific component of their opinion. (R. 26.)

## VI.    ANALYSIS

I agree with the plaintiff that the ALJ failed properly to evaluate the expert opinion evidence, and therefore that the Commissioner's decision was not supported by substantial evidence in the record. Only one of the four medical opinions in the record – Dr. Naroditsky's – supports the ALJ's conclusion that plaintiff was capable of full-time light work, and therefore capable of performing her past relevant work. In rejecting Dr. Ravi's contrary opinion as to plaintiff's exertional capacity, however, the ALJ misread the record, writing that, during her appointment with Dr. Ravi, plaintiff "had no difficulty sitting." (R. 17.) In fact, Dr. Ravi observed just the opposite. (R. 391.) Moreover, while it is true that "moderate" exertional limitations are not inconsistent with light work, Dr. Ravi opined that plaintiff had "moderate to marked" limitations in bending, pushing, pulling, lifting, and carrying. (R. 393.) If accepted by the ALJ, these limitations could preclude plaintiff's prior work, requiring the ALJ either to adduce expert evidence as to other jobs that plaintiff might still perform or find her disabled.

The ALJ further erred in finding Dr. Naroditsky's opinion "generally persuasive" simply because he "reviewed the available medical records" (R. 19), while at the same time implicitly rejecting Dr. Putcha's opinion – which he also found "generally persuasive," for the same reason, but which would have precluded plaintiff's prior relevant work. To the extent the ALJ credited Dr. Naroditsky over Dr. Putcha based on plaintiff's "updated records" (*id.*), his reasoning makes little sense, as it was Dr. Putcha who reviewed an expanded record on reconsideration– including the treatment notes from Columbia University and Dr. Pesala, which Dr. Naroditsky never saw. (*Compare* R. 84-85 *with* R. 70-71.)

As for Dr. Do Ouro and PA Shtofmakher, the ALJ correctly found that their opinion was inconsistent with other evidence in the record, including – to some extent – their own treatment records. However, the Commissioner impermissibly cherrypicked the record when he highlighted plaintiff's October 8, 2021 visit – during which she told PA Shtofmakher that her symptoms were "85% improved," denied "significant side effects related to medications," and indicated that her "level of function [was] higher on the current regimen of medications" (R. 18, referencing R. 601) – without mentioning that just three days later, on October 11, 2021, plaintiff reported a variety of symptoms, including sweats, syncope, and numbness, and was "instructed to report to ER." (R. 597.) According to plaintiff's hearing testimony, moreover, these symptoms required her to discontinue her medication regimen until treating providers "find out exactly . . . what it was that triggered my body to start going into the numbness." (R. 38.) On remand, therefore, the ALJ should reevaluate all four medical opinions in the record in accordance with applicable regulations.

**A.   Standards**

In considering the parties' briefs, I have reviewed the entire administrative record (totaling 727 pages) and applied the familiar and frequently reiterated standards used by federal district courts to review decisions of the Commissioner. A court may set aside an ALJ's decision only if it is based upon legal error or if the ALJ's factual findings are not supported by substantial evidence. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Conyers v. Comm'r of Soc. Sec.*, 2019 WL 1122952, at *11-13 (S.D.N.Y. Mar. 12, 2019). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada*, 167 F.3d at 773).

"The court reviews the ALJ's application of legal standards *de novo*." *Sawicki v. Comm'r of Soc. Sec.*, 2023 WL 5164212, at *6 (S.D.N.Y. Aug. 11, 2023) (citing *Townley v. Heckler*, 748

F.2d 109, 112 (2d Cir. 1984)). A finding of legal error will result in remand, unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the error harmless. *Garcia v. Berryhill*, 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

In applying the substantial evidence standard, however, the district court does not "determine *de novo* whether [the Plaintiff] is disabled." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although the reviewing court "must consider the whole record, examining the evidence from both sides," *Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009), its task is "limited to determining whether substantial evidence exists to support the ALJ's fact-finding[.]" *Dubois v. Comm'r of Soc. Sec.*, 2022 WL 845751, at *4 (S.D.N.Y. Mar. 21, 2022). The court "may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than one interpretation." *Id.* Thus, the substantial evidence standard is "a very deferential standard of review." *Id.*

A claimant's RFC is the "most [she] can still do despite [her] limitations," 20 C.F.R. § 404.1545(a)(1), and is based on all of the relevant medical and other evidence in the record, including her credible testimony, the objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. § 404.1545(a)(3). "An RFC finding is administrative in nature, not medical, and its determination is within the province of the ALJ[.]" *Curry v. Comm'r of Soc. Sec.*, 855 Fed. App'x 46, 48 n.3 (2d Cir. 2021).In determining a claimant's RFC, however, the ALJ must consider, among other things, any medical opinions or prior administrative medical

findings in the record (collectively, opinions) regarding what the claimant can still do. *See* 20 C.F.R. §§ 404.1520c, 404.1545(a), 404.1546(c).

When evaluating the medical opinion evidence, the ALJ need not "defer" or "give any specific evidentiary weight, including controlling weight," to any one medical opinion. 20 C.F.R. § 404.1520c(a). Rather, the ALJ must evaluate the "persuasiveness" of each opinion in light of: (i) its "[s]upportability"; (ii) its "[c]onsistency"; (iii) the "[r]elationship" between the medical source and the claimant; (iv) the source's "[s]pecialization" in a relevant medical field; and (v) "other factors that tend to support or contradict" the opinion. *Id.* § 404.1520c(c)(1)-(5). Of these, the "most important factors" are supportability and consistency. *Id.* § 404.1520c(a). The ALJ need not discuss all of the factors described in the regulations, but he must, as to each opinion, "explain how [he] considered the supportability and consistency factors." *Id.* § 404.1520c(b)(2). These "articulation requirements" are intended to "allow a subsequent reviewer or a reviewing court to trace the path of an adjudicator's reasoning." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017) (Revisions). Thus, an ALJ commits "procedural error by failing to explain how [he or she] considered the supportability and consistency of medical opinions in the record." *Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022) (summary order) (remanding for calculation of benefits).

Supportability "has to do with the fit between the medical opinion offered by the source and the underlying evidence and explanations 'presented' by that source to support her opinion." *Rivera v. Comm'r of Soc. Sec. Admin.*, 2020 WL 8167136 at *16 (2d Cir. May 14, 2021). Thus, in evaluating supportability, an ALJ compares the opinion with the "objective medical evidence and supporting explanations" presented by the opining source. 20 C.F.R. § 404.1520c(c)(1). Consistency is a broader inquiry, "focused on how well a medical source is supported, or not

supported, by the entire record," which may or may not contain another medical opinion as a comparator. *Vellone on behalf of Vellone v. Saul*, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021).

The ALJ is not required to accept, or follow, any one medical opinion. *See Camille v. Colvin*, 652 Fed. App'x 25, 29 n.5 (2d Cir. 2016) (summary order) ("An ALJ may accept parts of a doctor's opinion and reject others."). However, "[t]he ALJ is not permitted to substitute his own expertise or view of the medical proof for . . . any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

### B.      The ALJ Erred in Evaluating Dr. Ravi's Opinion

Dr. Ravi observed that plaintiff "had difficulty with sitting" and "difficulty rising from the chair due to pain," noted that her gait was "moderately antalgic," and found on examination that she had significantly reduced ROM in the lumbar spine, the hips, and the left knee, as well as decreased sensation in both hands and both feet. (R. 391-92.) On this basis he opined that plaintiff had "moderate to marked" limitations in bending, pushing, pulling, lifting, and carrying, and "moderate" limitations in sitting, standing, and walking. (R. 393.) The ALJ, as noted, above, found Dr. Ravi's opinion only "partially persuasive," because (i) "treatment records thereafter mostly documented minimal findings"; (ii) Dr. Ravi used the term "moderately," which "is vague and generally supports limits for light work"; and (iii) the opinion is "inconsistent as Dr. Ravi first notes moderate limits sitting and then finds no limits sitting." (R. 17.)

Significantly, the ALJ did not discuss the supportability of Dr. Ravi's opinion; that is, whether his opinion was supported by the "objective medical evidence and supporting explanations" presented in his own report, as required by 20 C.F.R. § 404.1520c(c)(1). This was error. *See Sawicki*, 2023 WL 5164212, at *11 ("The legal error is that the ALJ did not address the

26

issue."); *Ayala v. Kijakazi*, 620 F. Supp. 3d 6, 30 (S.D.N.Y. 2022) ("[A]n ALJ's failure to properly consider and explain the supportability and consistency factors constitute grounds for remand.").

Such an error may be deemed harmless if "a searching review of the record assures us that the substance of the regulation was not traversed." *Loucks*, 2022 WL 2189293, at *2 (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)) (cleaned up); *see also Nunez v. Comm'r of Soc. Sec.*, 2024 WL 474045, at *22 (S.D.N.Y. Jan. 8, 2024) ("An ALJ commits procedural error by failing to explain how he considered the supportability and consistency of medical opinions in the record," but "[a] reviewing court still may affirm if 'a searching review of the record' assures it 'that the substance of the [regulation] was not traversed.'") (quoting *Loucks*, 2022 WL 2189293, at *2), *report and recommendation adopted,* 2024 WL 262793 (S.D.N.Y. Jan. 24, 2024). In this case, however, when describing Dr. Ravi's opinion, the ALJ misread his report, writing that plaintiff had "no difficulty sitting" during the exam (R. 17), when in fact Dr. Ravi observed just the opposite. (R. 391.)

This was a non-trivial error, going directly to the "fit" between the consultative examiner's opinion and the evidence underlying that opinion, *Rivera*, 2020 WL 8167136, at *16, and making it impossible for this Court to conclude that the ALJ properly considered the supportability factor. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (affirming remand where the reason given by the ALJ for discounting a treating physician's report was "factually incorrect"); *Johnson v. Kijakazi*, 2021 WL 5513491, at *14-15 (S.D.N.Y. Nov. 24, 2021) ("In weighing the medical opinion evidence – as in assessing credibility – an ALJ may not rely upon a factually inaccurate description of the record."); *Conyers*, 2019 WL 1122952, at *20-21 ("If an ALJ commits 'factual errors in evaluating the medical evidence,' his decision is not supported by substantial evidence.")

(quoting *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996)). In this case, therefore, the ALJ's failure to discuss the supportability of Dr. Ravi's opinion cannot be deemed harmless error.[10]

The ALJ further erred when he critiqued Ravi's use of the term "moderate" as "vague." (R. 17.) "[T]he mere use of the phrase 'moderate limitations' does not render a doctor's opinion vague or non-substantial for purposes of the ALJ's RFC determination." *Mancuso v. Kijakazi*, 2023 WL 6520294, at *10 (S.D.N.Y. Aug. 15, 2023) (quoting *Tudor v. Comm'r of Soc. Sec.*, 2013 WL 4500754, at *12 (E.D.N.Y. Aug. 21, 2013)), *report and recommendation adopted,* 2023 WL 6311289 (S.D.N.Y. Sept. 28, 2023). Accordingly, the use of such terms is not grounds for discounting a medical opinion, so long as that opinion "was supported by 'additional information,' *i.e.*, objective medical findings." *Tudor*, 2013 WL 4500754, at *12; *accord Riso v. Saul*, 2020 WL 1514697, at *2 (W.D.N.Y. Mar. 30, 2020) ("Dr. Toor's use of terms such as 'mild,' 'moderate' and 'marked' does not render his opinion unduly vague in light of the fact that it was based on an in-person examination with a host of objective findings").

Finally, the ALJ erred in finding Dr. Ravi's opinion "partially persuasive" without explaining which parts he accepted and which parts he rejected. *See Kande v. Comm'r of Soc. Sec.*, 2020 WL 3871218, at *9 (S.D.N.Y. July 9, 2020) ("The ALJ's failure to identify portions of Dr. Archbald's opinion on which she relied and those she rejected is erroneous[.]"); *Cloud v. Comm'r of Soc. Sec.*, 2020 WL 5200695, at *3 (W.D.N.Y. Sept. 1, 2020) (where the ALJ's decision was "unclear as to which portions of Dr. Zali's opinion the A.L.J. decided to accord some weight and which portions she rejected," the Court could not "meaningfully review the A.L.J.'s decision,

---

[10] The ALJ noted that immediately after the sentence stating that plaintiff had "moderate" limitations in sitting, standing, and walking, another sentence in Dr. Ravi's report stated, "No limitations sitting." (R. 393.) Had the ALJ correctly read the record, however – including Dr. Ravi's direct observation of plaintiff's difficulties in sitting – he would likely have recognized the second sentence as an editing error.

warranting remand"). Here, as in *Cloud*, the Court cannot "meaningfully review" the ALJ's decision without knowing, for example, whether he accepted or rejected Dr. Ravi's opinion that plaintiff had "moderate to marked" limitations in bending, pushing, pulling, lifting, and carrying. (R. 393.)

This matters because, while "moderate" exertional limitations are consistent with an RFC for light work, *see White v. Berryhill*, 753 F. App'x 80, 82 (2d Cir. 2019) (summary order); *Ruiz v. Comm'r of Soc. Sec.*, 625 F. Supp. 3d 258, 268 (S.D.N.Y. 2022) (collecting cases), "moderate to marked" limitations – particularly as to multiple exertional functions – may preclude such an RFC. *See Buczynski v. Comm'r of Soc. Sec.*, 2019 WL 5540880, at *4 (W.D.N.Y. Oct. 28, 2019) (collecting cases). At a minimum, where the ALJ has accepted a medical opinion assessing "moderate to marked" exertional limitations, while also finding the claimant capable of "light" work, he must explain why the assessed limitations are not inconsistent with the RFC. *See, e.g.*, *Smith v. Comm'r of Soc. Sec.*, 2020 WL 4904956, at *3 (W.D.N.Y. Aug. 19, 2020) (remanding where medical opinion found plaintiff "moderately to markedly limited in standing, walking, lifting, or carrying," but the ALJ "did not explain how that led him to conclude that [plaintiff] could lift [and] carry. . . ten pounds frequently and twenty pounds occasionally, let alone occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl") (citations and internal quotation marks omitted); *Jeffery A. v. Comm'r of Soc. Sec.*, 2020 WL 1234867, at *10 (N.D.N.Y. Mar. 13, 2020) (remanding where ALJ failed to explain "how light work is consistent with moderate to marked limitations in walking, standing, sitting long periods, bending, stair climbing, lifting, or carrying"); *Otts v. Colvin*, 2016 WL 6677192, at *4 (W.D.N.Y. 2016) (remanding where ALJ did not explain how plaintiff could perform light work, despite physician's opinion that she had a "moderate to marked" restriction for lifting).

In short, if the ALJ agreed with Dr. Ravi that plaintiff had "moderate to marked" limitations in pushing, pulling, lifting, and carrying, he was required – at a minimum – to explain "how that led him to conclude that [plaintiff] could lift [and] carry . . . ten pounds frequently and twenty pounds occasionally, let alone occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl." *Smith*, 2020 WL 4904956, at *3. If, on the other hand, the ALJ rejected that portion of Dr. Ravi's opinion, the analytical errors identified above could not be deemed harmless. *See Nunez*, 2024 WL 474045, at *22 (error in assessing medical opinion was not harmless where "a finding of greater limitations," as opined by the doctor, "could result in a determination that [the claimant] was unable to work"); *accord Sawicki*, 2023 WL 5164212, at *11. Remand is therefore required.

## C.     The ALJ Erred in Evaluating Dr. Naroditsky's and Dr. Putcha's Opinions

The Commissioner is correct that the applicable regulations "do not prioritize" the assessments of treating or examining sources over non-examining sources. Def. Br. at 21. However, those regulations do require the ALJ to discuss the "[s]upportability" and "[c]onsistency" of *each* medical opinion in the record, 20 C.F.R. §§ 404.1520c(c)(1)-(2); *id.* § 404.1520c(b)(2), including the opinions that the ALJ relies on as persuasive. *See Loucks*, 2022 WL 2189293, at *2 (finding error and remanding for calculation of benefits where, as to the only opinion that the ALJ found persuasive, the ALJ failed to discuss "supportability or explain how the opinion was consistent with the record, except to conclude that it was"); *Ayala*, 2022 WL 3211463, at *31 (S.D.N.Y. Aug. 9, 2022) (remanding where the ALJ found the opinions of Dr. Chen and Dr. Healy persuasive but "offered only that 'Dr. Chen's opinion is supported by record review' and that 'Dr. Healy's opinion is supported by examination,'" without further discussion).

Here, the ALJ found both Dr. Naroditsky's opinion and Dr. Putcha's opinion "generally persuasive," because "both physicians reviewed the available medical record." (R. 19.) While he noted that Dr. Putcha "opined that the claimant could perform sedentary work," the ALJ ultimately

credited Dr. Naroditsky's opinion that plaintiff could perform light work; that is, that she could lift and carry 20 pounds occasionally and 10 pounds frequently, and sit, stand, and walk, each for up to 6 hours during an 8-hour workday. (R. 18.) The ALJ explained that this decision was "based on updated records noting stable gait and improved pain with injections[.]" (*Id.*) There is no other discussion of either the supportability or the consistency of either state agency reviewer's opinion. Nor did the ALJ explain how why – as between two "generally persuasive" opinions – he relied on "updated records" to credit Dr. Naroditsky's opinion (rendered in February 2021, on a limited record) over Dr. Putcha's (rendered in August 2021, just four months before plaintiff's hearing, on an expanded record, including treating notes from Columbia University and Dr. Pesala).[11]

By failing to properly articulate the supportability and consistency factors, the ALJ failed to comply with § 404.1520c(b). Moreover, because he was faced with "two or more medical opinions or prior administrative medical findings about the same issue that are both equally well-supported [] and consistent with the record [] but are not exactly the same," he was required to discuss the remaining § 404.1520c(c) factors (*i.e.*, relationship with the claimant, specialization, and other relevant factors), *Prieto v. Comm'r of Soc. Sec.*, 2021 WL 3475625, at *8 (S.D.N.Y. Aug. 6, 2021) (quoting 20 C.F.R. § 404.1520c(b)(3)); *see also* Revisions, 82 Fed. Reg. 5844, 5858, which he did not do. These errors are grounds for remand. *See Prieto*, 2021 WL 3475625, at *9 ("[A]n ALJ's failure to properly consider and apply the requisite factors is grounds for remand.") (internal quotation marks, citation, and alteration omitted); *Jackson v. Kijakazi*, 588 F. Supp. 3d

---

[11] Those records included, among other things, Dr. Reid's July 28, 2020 note that plaintiff "has clearly been in a lot of pain for a long time" (R. 376); plaintiff's report of gastrointestinal symptoms, including diarrhea, on December 21, 2020, July 27, 2021, and August 10, 2021 (R. 384, 526, 529); Dr. Sardar's clinical finding, on December 21, 2020, that plaintiff's gait was antalgic (R. 385); and Dr. Pesala's observation that plaintiff was using a cane June 15, 2021 (although her gait, station, and reflexes were normal that day). (R. 534.)

558, 587 (S.D.N.Y. 2022) ("Because the ALJ improperly assessed the medical evidence by not specifically addressing the supportability and consistency factors, the case must be remanded[.]").

The ALJ further erred, when discussing the "updated records" on which he relied to credit Dr. Naroditsky's opinion over Dr. Putcha's, by cherry-picking those records. When evaluating medical opinion evidence, the ALJ "need not discuss every treating note from every physician who ever saw the claimant. However, he is not entitled to 'selectively cite the treating notes or diagnostic imaging that support his finding of disability while failing to address other contrary evidence.'" *Marrero Santana v. Comm'r of Soc. Sec.*, 2019 WL 2330265, at *13 (S.D.N.Y. Jan. 17, 2019) (quoting *Annabi v. Berryhill*, 2018 WL 1609271, at *16-17 (S.D.N.Y. Mar. 30, 2018) (collecting cases)), *report and recommendation adopted,* 2019 WL 2326214 (S.D.N.Y. May 30, 2019) (Broderick, J.); *Jackson*, 588 F. Supp. 3d at 585 (S.D.N.Y. 2022) ("Courts frequently remand an ALJ's decision when it . . . cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary."); *Feliciano v. Comm'r of Soc. Sec.*, 2022 WL 4646496, at *5 (E.D.N.Y. Sept. 30, 2022) ("The ALJ cannot selectively choose only the part of the evidence that supports his conclusions.") (quoting *Thompson v. Apfel*, 1998 WL 720676, at *6 (S.D.N.Y. Oct. 9, 1998)).

The updated records referenced by the ALJ – consisting of treating notes from Dr. Do Ouro and Dr. Bank (*see* R. 19, referencing R. 601, 611, 669, 670) – do not, in fact, clearly support Dr. Naroditsky's opinion over Dr. Putcha's. It is true that both Dr. Do Ouro and Dr. Bank observed plaintiff walking with a normal gait. (*See* R. 647, 669-70.) However, the ALJ's focus on plaintiff's "improved pain with injections" suggests that he took a selective view of those updated records. Read fairly, Dr. Do Ouro's notes (much like the records reviewed by Dr. Putcha) show that plaintiff

typically experienced only short-term pain relief from the injections she was given, after which she frequently reported side effects or complications that worsened her underlying condition.

For example, after her October 5, 2021 injection by Dr. Do Ouro (R. 608-11), plaintiff reported on October 8, 2021, that "the pain condition has been improved," to 7/10; that she was not experiencing "significant side effects"; and that her "level of function" was "higher on the current regimen," which also included Celebrex and hydromorphone. (R. 601, 607.) But three days later, on October 11, 2021, plaintiff reported sweats, syncope, and numbness, and was "instructed to report to ER." (R. 597.) Thereafter, plaintiff told the ALJ, the medication regimen responsible for her higher level of functioning was suspended until her doctors "find out exactly . . . what it was that triggered my body to start going into the numbness." (R. 38.) In crediting Dr. Naroditsky's opinion over Dr. Putcha's, the ALJ highlights Dr. Do Ouro's October 5 note (R. 18), but does not mention the October 11 note. Nor, for that matter, does the ALJ ever discuss plaintiff's hearing testimony, or the notes of her other treating providers, concerning negative side effects from her various treatments. (*See, e.g.*, R. 34-35 (testifying that "five days after I receive [sic] the injection my body's been going in and out of numbness"); R. 490 (reporting that "2 spinal epidural injections in 2020 . . . increased her pain and she did not return for more injections"); R. 675 ("Did not tolerate epidural injections, although had benefit, as per the PMR"); R. 685-86 ("She did not notice much relief from injection, states she felt relief for 2-3 days which then returned in severity."); R. 707 ("Patient endorses noting significant relief for a few days from the injection," but "began to feel abdominal pain 4-5 days ago[.]").

Here, as in *Loucks*, the ALJ's selective citation to the portions of the record most consistent with his own conclusions – when combined with the errors discussed above – warrants remand. 2022 WL 2189293, at *2 (remanding where ALJ failed to address supportability and consistency

and instead "selectively relied on portions of the record that showed improvement without even addressing the weight of the evidence supporting the fact that Loucks continued to have serious psychiatric symptoms even after years of treatment and steadily increasing medication."). *Accord Jackson*, 588 F. Supp. 3d at 585-86; *Prieto*, 2021 WL 3475625, at *14-15.

### D.      The ALJ Erred in Evaluating Dr. Do Ouro's Opinion

The ALJ correctly noted that the October 2021 opinion of Dr. Do Ouro and PA Shtofmakher was "inconsistent" with other evidence in the record, including "contemporaneous neurology consultation . . . and reports of Dr. Pesala." (R. 18.) Likewise, the ALJ was entitled to conclude that the Do Ouro/Shtofmakher opinion was unsupported by their own treatment records, which reflected that plaintiff had "normal ambulation and gait, and no neuro or musculoskeletal deficits." (*Id*.) I note as well that some of the signs and symptoms listed in the October 2021 opinion, including joint deformity, crepitus, joint instability, abnormal posture, and trigger points (R. 498), appear for the first time in that document, uncorroborated by anything in these providers' treating notes. I therefore reject plaintiff's contention that the ALJ was required to accept the highly restrictive opinion of Dr. Do Ouro and PA Shtofmakher (which would be work-preclusive).[12]

---

[12] I also reject plaintiff's contention that, in evaluating the medical opinion evidence, the ALJ was required to consider the December 2, 2021 decision of plaintiff's Medicaid plan to approve her for a part-time home health aide. *See* Pl. Br. at 20 (arguing that this evidence "further supports the assessment of the treating healthcare providers"). As the applicable regulation explains:

> Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us . . . . Therefore, in claims filed . . . on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits.

Once again, however, in explaining why he found the Do Ouro/Shtofmakher opinion unpersuasive, the ALJ cherry-picked the record, emphasizing plaintiff's report of a brief respite in her symptoms on October 8, 2021 (R. 18), without acknowledging – anywhere in the Decision – that plaintiff consistently reported only short-term relief (at best) from the many injections she received over the relevant period. (R. 608-11, 695 702, 715.) *See Marrero Santana*, 2019 WL 2330265, at *12-13 (ALJ erred by relying on "only two" out of twelve progress notes in order to assign "little weight" to treating physician's opinion). Thus, although he adequately analyzed the supportability and consistency factors with regard to the Do Ouro and Shtofmakher opinion, the ALJ nevertheless erred in his evaluation because he relied on a selective reading of the record.

## VII.   CONCLUSION

Because the ALJ erred in evaluating the medical opinion evidence, and because those errors were not harmless, the resulting RFC determination "was necessarily flawed." *Mack v. Comm'r of Soc. Sec.*, 2021 WL 3684081, at *12 (S.D.N.Y. July 26, 2021), *report and recommendation adopted,* 2021 WL 3683628 (S.D.N.Y. Aug. 17, 2021); *see also Betancourt-Algarin*, 2022 WL 5176862, at *11 ("[B]ecause the medical opinion evidence in the record was not properly analyzed, the Court cannot conclude that the ALJ's RFC formulation, and ultimate disability determination, was supported by substantial evidence."); *Marrero Santana*, 2019 WL 2330265, at *13 ("Because the ALJ violated the treating physician rule," which at that time

___

20 C.F.R. § 404.1504. Here, the only document before the ALJ concerning the home health aide is a two-page Approval Notice, which discloses only that the service was approved as "medically necessary." (R. 722.) The Approval Notice does not explain the standard used to determine medical necessity, and does not disclose any of the evidence underlying the approval. Consequently, the ALJ properly ignored it. *See Betancourt-Algarin*, 2022 WL 5176862, at *10 (S.D.N.Y. Aug. 5, 2022) (ALJ "could safely ignore" a physician's opinion, prepared for workers' compensation purposes), *report and recommendation adopted,* 2022 WL 3867851 (S.D.N.Y. Aug. 30, 2022).

governed the evaluation of expert medical opinion, "his RFC determination – that plaintiff is capable of the full range of sedentary work – was not supported by substantial evidence.")

Without reaching plaintiff's remaining challenges to the Decision, therefore, I recommend, respectfully, that this action be REMANDED to the Commissioner to reevaluate the medical opinion evidence – in accordance with 20 C.F.R. §§ 404.1520c(c)(1)-(5) and 404.1520c(b)(2) and in light of the entire record – and to reconsider plaintiff's RFC. If, on remand, the ALJ finds that plaintiff is not capable of performing her past relevant work, he must proceed to step five and adduce expert vocational evidence as to whether plaintiff can "make an adjustment to other work," 20 C.F.R. § 404.1520(a)(4)(v), that "exist[s] in significant numbers in the national economy." *Id*. § 404.1560(c)(1).

Dated: New York, New York
         May 31, 2024

**BARBARA MOSES**
**United States Magistrate Judge**


## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Vernon S. Broderick at 40 Foley Square, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Broderick. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).